Carol MAJESKE, John Azara, Fred Barham, et al., Plaintiffs–Appellants,

v.

FRATERNAL ORDER OF POLICE, LOCAL LODGE NO. 7, Defendants–Appellees.

No. 95–3354.

United States Court of Appeals, Seventh Circuit.

Argued May 16, 1996.

Decided Aug. 23, 1996.

**308**

Kimberly A. Sutherland (argued), Chicago, IL, Ronald A. Bredemann, Flood & Bredemann, Des Plaines, IL, for John Azara, Fred Barham, Susan Barrett, Donald Barry, James Bartosik, Joanne Botwinski, Nancy Bringe, Ellwood Brockman, Ray Broderdorf, Peter Bukiri, Carolyn C. Burauer, Michael Burke, Phillip Cappitelli, Michael Chevalier, Thomas Coughlin, Eugene Chudy, Terrence Clark, Patrick Conroy, William Coogan, Robert Cooper, Robert Craig, Charlotte Danovaro, William Davis, Dolores Diedrich, and John Broderick.

Kimberly A. Sutherland, Chicago, IL, for Carol Majeske.

Sarah Vanderwicken, Despres, Schwartz & Geoghegan, Chicago, IL, Lawrence Rosenthal, Terence J. Moran, Jay M. Kertez, Benna R. Solomon, Anne K. Berleman, Susan S. Sher, Office of Corp. Counsel, Appeals Div., Chicago, IL, for City of Chicago, Ill., LeRoy Martin, Charles Ford, Edward Brooks, Hubert W. Holton, Glenn Carr, Richard M. Daley, Gerald Cooper, Kelly R. Welsh, Susan Sher, Lawrence Rosenthal, and Sarah Vanderwicken.

Laura M. Finnegan (argued), Baum, Sigman, Auerbach, Pierson & Neuman, Chicago, IL, Sarah Vanderwicken, Despres, Schwartz & Geoghegan, Chicago, IL, Lawrence Rosenthal, Terence J. Moran, Jay M. Kertez, Susan S. Sher, Office of Corp. Counsel, Appeals Div., Chicago, IL, for Fraternal Order of Police, Lodge 7.

Before EASTERBROOK, RIPPLE, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

This case is part of a multi-court, multi-tribunal challenge brought by the plaintiffs against the City of Chicago and the Fraternal Order of Police, complaining about the promotion process within the Police Department. It demonstrates the risks, as well as the inefficiencies, of keeping too many balls up in the air at the same time. This particular part of the case involves the claims of Carol Majeske and other white Chicago police officers (all members of the FOP) against the FOP itself, claiming that it discriminated against them in violation of 42 U.S.C. §§ 1981, 1983 and 1985(3), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(c)(1). We conclude that the district court correctly disposed of each of these claims, and we therefore affirm its judgment.

Since 1981, the FOP has been the certified exclusive collective bargaining representative for all City of Chicago police officers below the rank of sergeant. Sections 10.1 and 10.2 of the collective bargaining agreement provides that the employer will provide equal employment opportunity for all officers and that it will not discriminate on the basis of criteria including race, color, sex, religion, age or national origin. Prior to 1989, the Chicago Police Department (CPD) had issued a general order providing that 15 percent of its promotions to detective would be on the basis of "merit"—that is, the officer's record as a whole—and the other 85 percent would be pursuant to a promotional exam only. In February 1989, the City administered a new three-part examination for use in detective promotions, which included a written section, a multiple choice section, and an oral board.

In July 1990, the City, concededly with no involvement by the FOP, decided not to make promotions solely based on raw test rankings. Instead, it took a number of steps designed to address possible racial bias against minority candidates in the promotion procedure. First, it "standardized" the test results to take race and national origin of the applicants into account and created a promotion list based on the standardized rankings. Next, the CPD amended the general order about merit promotions, increasing the percentage of candidates selected under the merit system from 15 percent to 30 percent. Using this hybrid system, it made 90 promotions in July 1990: 64 drawn from the list (of whom 42 were drawn in rank order and 22 out of rank order), and 26 under the merit system. The 26 merit promotions went to 14 white applicants, eight African–American applicants, and four Hispanic candidates.

The FOP filed two grievances on August 21, 1990, claiming that the City had violated the non-discrimination clause of the collective bargaining agreement in the 22 promotions that had been made out of rank order and the 26 merit promotions. The case was submitted to Arbitrator Anthony Sinicropi. On October 30, 1991, Sinicropi issued a decision finding that the City had violated its collective bargaining agreement with the FOP by using race as a factor in promoting detectives out of rank order. He directed the City to promote patrol officers to the 90 detective positions based solely on their "qualifications" and to compensate the individuals who had suffered discrimination under the challenged system. At the same time, however, Sinicropi found that the procedures used to select the 26 merit candidates did not violate the collective bargaining agreement.

On November 20, 1991, the FOP filed a third grievance, protesting the City's increase in the percentage of slots under the merit system, which was assigned to Arbitrator Peter Meyers in December 1991. Shortly thereafter, on January 17, 1992, Meyers entered a decision and award reflecting a settlement among the parties to the dispute that had been reached outside the formal arbitral procedure. Under the settlement, the parties agreed that no more than 20

percent of future promotions to the rank of detective and youth officer would be "merit" promotions. Furthermore, the decision directed the City to promote 20 officers in rank order from the competitive testing list to the position of detective and eight officers in rank order from the competitive list to the position of youth officer. The award specified that no back pay would be required and that the City would not be required to demote "any meritorious detectives or youth officers promoted in 1990." All peace officers promoted based on this settlement were white.

Majeske and her co-plaintiffs were dissatisfied with the arbitral proceedings for several reasons. Most importantly, they believed that the settlement reflected in the Meyers award was a "sweetheart deal" in which the FOP had inappropriately acquiesced in the City's use of race as a factor in detective promotions. They also thought that the FOP had misrepresented the nature of the settlement in its communications to the membership. Accordingly, the Majeske plaintiffs filed a charge against the FOP before the Illinois Local Labor Relations Board (ILLRB), claiming that the FOP had breached its duty of fair representation under the Illinois Public Labor Relations Act, 5 ICLS § 315/6(d) (West 1992), when it assisted and acquiesced in the City's use of race as a factor in the promotions in question and in its conduct during the arbitral proceedings.

On January 21, 1993, the Executive Director of the ILLRB dismissed the charge in its entirety. He made three key findings: (1) there was no evidence of intentional discrimination by the FOP during the processing of the Sinicropi grievance, (2) the FOP violated no law or rule when it decided to settle the Meyers grievance prior to formal arbitration, nor did it violate any rule by its conduct in that case, and (3) the FOP made no misrepresentations or misleading omissions of information in its communications to its members concerning the arbitrations that amounted to intentional conduct, or conduct in bad faith. The ILLRB affirmed in a decision of May 25, 1993, and the Appellate Court of Illinois, First Judicial District, Second Division, affirmed the ILLRB's final or-

der dismissing the unfair labor practice charges in an opinion of August 23, 1994.

The Appellate Court's opinion contains a careful review of the underlying facts and the proceedings brought by the Majeske plaintiffs before the state tribunals. It reviewed Illinois law on the question of a union's duty of fair representation, noting that federal court rulings on the analogous duty under the National Labor Relations Act are persuasive authority in the state courts. Citing the leading federal decision, *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967), the court stated that "the duty of fair representation requires a union to serve the interests of all its members without hostility or discrimination, to exercise its discretion with good faith and honesty, and to eschew arbitrary conduct." See Appellee's Appendix at 92–93. It noted in particular that a union may settle or abandon a grievance if it acts in good faith. The union violates the duty of fair representation only by intentional misconduct in representing employees. 5 ILCS 315/10(b)(1).

In this case, the Appellate Court concluded that the FOP had settled the Meyers arbitration in good faith because it had legitimate doubts over whether it could prevail in the end. Although the Majeske plaintiffs were right, insofar as they argued that a victory would have meant the elimination of the practices to which they objected, victory is never a certainty before the fact. Had the FOP lost, the Majeske plaintiffs would have had to live with a 30 percent merit rate and an imprimatur of legality on the out of rank promotion system. The Appellate Court concluded that the settlement reflected in the Meyers award was "rationally based, within the bounds of [the FOP's] substantial discretion and, therefore, does not constitute intentional misconduct." It also commented that "[t]he fact that all the police officers promoted to detective based on the settlement were caucasian belies any claim that they settled the grievance with the intent to discriminate." The court noted that the Majeske parties had failed otherwise to present evidence that the FOP intended to discriminate. Finally, it concluded that the Chicago Municipal Code, § 2–74–050 (1984), provides the City with authority to make discretionary merit promotions. Following this decision, the Majeske plaintiffs did not pursue a motion for leave to appeal to the Illinois Supreme Court. Instead, they began to focus all their attention on their parallel federal court proceedings, to which we now turn.

Back in 1989, the very same Majeske plaintiffs, represented by the same lawyer, had filed suit in federal district court against the City of Chicago, claiming that various aspects of the promotion examination used for detective promotions were racially discriminatory. In September 1992, while the state administrative unfair labor practice charges were pending, the Majeske plaintiffs added the FOP as a party to their federal lawsuit. Their "Supplementary Complaint" alleged that the FOP had agreed with the City and assisted it in the use of race as a factor in the detective promotions, by agreeing to violate the Sinicropi arbitral award, by settling the Meyers arbitration in a manner contrary to the Sinicropi award, and by misleading the FOP membership about their rights under the test and the Sinicropi award—the very same allegations that were wending their way through the ILLRB and the Illinois courts.

In an order of January 21, 1994, the district court dismissed the plaintiffs' claim under 42 U.S.C. §§ 1981 and 1985(3) without prejudice and their § 1983 claim with prejudice. It also dismissed the Title VII claims without prejudice, finding that they did not state a claim that the FOP had "caused or attempted to cause" the City to discriminate against the Majeske group for purposes of 42 U.S.C. § 2000e–2(c)(3). It gave the plaintiffs an opportunity to amend their complaint to try to state a claim under 42 U.S.C. § 2000e–2(c)(1), which makes it unlawful for a labor organization to discriminate against any individual because of his race. They promptly did so, filing an amended complaint on January 31, 1994, against the FOP. This one claimed that the FOP had abandoned grievances that were the subject of the Sinicropi award, by choosing not to enforce that award, by allowing the City to make additional promotions from the July 1990 list, and by acquiescing in the Meyers award. It also

claimed that the FOP intended to help the City promote "blacks and hispanics to detective in numbers close to their applicant pools," and to "hold down the number of white promotions." On July 29, 1994, the district court denied the FOP's motion to dismiss the plaintiffs' Amended Supplemental Complaint under Rule 12(b)(6).

By this time, however, the Illinois litigation had caught up with the federal case. On November 23, 1994, long enough after the August 23, 1994, opinion of the Appellate Court of Illinois for it to be final, the FOP filed a new motion for summary judgment arguing that the Majeske plaintiffs were precluded from litigating their Title VII claim on grounds of claim preclusion. This time the district court agreed, and in an order of March 2, 1995, the court granted the FOP's motion for summary judgment on the Title VII claim. On August 30, 1995, the district court denied the plaintiffs' Rule 59(e) motion to reconsider its March 2, 1995, order and granted the FOP's request for an order under Fed.R.Civ.P. 54(b) directing final judgment for the FOP on all claims.

Majeske presents two principal issues on appeal: first, whether the district court erred in granting the FOP's motion to dismiss the actions brought under 42 U.S.C. §§ 1981, 1983, and 1985(3), on the ground that they failed to state a claim, and second, whether the district court erred in concluding that the Title VII action was precluded by the prior Illinois proceedings. It is important to recall, as we evaluate these theories, that we are concerned here only with the suit against the FOP, not with the other aspects of this complex case as it may pertain to other parties.

■ *Claims under 42 U.S.C. §§ 1985(3) and 1983.* A plaintiff raising a claim under § 1985(3) must allege (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens. *United Brotherhood of Carpenters and Joiners, Local 610, et al. v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3355–56, 77 L.Ed.2d 1049

(1983), citing *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971); *Bowman v. City of Franklin,* 980 F.2d 1104, 1108–09 (7th Cir. 1992). The plaintiff must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action," and (2) that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 267–68, 113 S.Ct. 753, 758–59, 122 L.Ed.2d 34 (1993), citing *Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798, and *Scott,* 463 U.S. at 833, 103 S.Ct. at 3358–59. Similarly, a claim under § 1983 alleging racial discrimination must allege purposeful discrimination. See, e.g., *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272, 279, 99 S.Ct. 2282, 2292–93, 2296, 60 L.Ed.2d 870 (1979) (discussing intent requirement for equal protection claims in general).

■ Majeske's complaint alleged that "the City, under color of state law, with the agreement and assistance of the FOP, used race and national origin as a motivating factor in Chicago police detectives' promotions for the purpose of excluding whites, including plaintiffs, from promotion to detective on the basis of their race, in violation of plaintiffs' right to equal protection and rights under Title VII." Whatever this may allege about *the City's* intent, it falls short of an allegation that the FOP acted with the intent to deprive white officers of equal protection. Other pertinent allegations about the FOP's actions suffer from the same problem:

> (para. 34) the FOP and City agreed to promote from the race-based July 1990 detectives list.

> (same) the FOP and City agreed to increase from 15 percent to 20 percent the race-based, so-called "meritorious" detectives' promotions

> (para. 40) [the FOP acted] wilfully or in gross disregard of plaintiffs' rights

These allegations fall short of a claim that the FOP acted intentionally. Disparate impact alone does not satisfy the pleading requirements for either § 1983 or § 1985(3).

The district court therefore correctly dismissed this claim on the pleadings.

■ *Claim under 42 U.S.C. § 1981.* This claim, which the district court dismissed on the pleadings without prejudice, also founders on the "intent" requirement. Section 1981 (now codified as § 1981(a)) prohibits discrimination in the making and enforcement of private contracts. *Patterson v. McLean Credit Union,* 491 U.S. 164, 172, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989); *Runyon v. McCrary,* 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976). In order to prevail, a plaintiff again must prove that she has been the victim of intentional discrimination. *Melendez v. Illinois Bell,* 79 F.3d 661, 669 (7th Cir.1996); *Palmer v. Board of Education of Community Unit School District 201–U, Will County,* 46 F.3d 682, 687 (7th Cir.1995) (sec. 1981 is designed to forbid disparate treatment, not disparate impact).

■ A § 1981 claim may be brought against a labor organization like the FOP when "the collective bargaining agreement contains an express clause binding both the employer and the union not to discriminate on racial grounds," as the FOP agreement did, and when the labor organization as the collective bargaining agent intentionally avoids asserting discrimination-based claims. See *Daniels v. Pipefitters' Association Local No. 597,* 945 F.2d 906, 916 (7th Cir.1991); *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 669, 107 S.Ct. 2617, 2625, 96 L.Ed.2d 572 (1987). For understandable reasons, however, Majeske did not allege that the FOP failed to file grievances because of a desire to discriminate against its white members. The opposite happened: it filed three grievances in response to the City's promotion plans, each one challenging the race-conscious features of the scheme. Furthermore, Majeske is plainly satisfied with the outcome of two of these grievances, embodied in the Sinicropi award. Her only complaint is that the FOP should not have settled the Meyers arbitration on the grounds that it did, which left some room (albeit considerably reduced) for race-conscious measures. If it were possible to prove "intentional avoidance" discrimination claims merely by showing that a settlement fell short of total victory for the union, this would be tantamount to saying that unions could never settle litigation or arbitration. We decline to adopt such an extreme position. Nothing else in Majeske's pleadings suffices to support a claim that the FOP's actions or failures to act amounted to intentional discrimination. The § 1981 claim was therefore also correctly dismissed.

■ *The Title VII claim.* Last, we come to the claims brought under Title VII, which so closely track the state court proceedings we have detailed above. The district court dismissed this part of the case under the claim preclusion branch of the law of judgments. Our analysis begins with the Full Faith and Credit Act, which provides that the "judicial proceedings" of any State "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State." 28 U.S.C. § 1738. As the Supreme Court recently noted in *Matsushita Electric Industrial Co. v. Epstein,* —— U.S. ——, ——, 116 S.Ct. 873, 877, 134 L.Ed.2d 6 (1996), the Act "thus directs all courts to treat a state court judgment with the same respect that it would receive in the courts of the rendering state." Federal courts must accept that state's rules for determining the effect of the judgment. *Id.,* quoting *Kremer v. Chemical Construction Corporation,* 456 U.S. 461, 481–82, 102 S.Ct. 1883, 1897–98, 72 L.Ed.2d 262 (1982).

■ The fact that a judgment incorporates the results of a settlement, rather than being the result of full litigation on the merits, makes no difference for the application of § 1738. This, indeed, was the situation in *Matsushita,* where the Court expressly held that a state court judgment embodying the settlement of class action claims had to be assessed under § 1738, just like any other judgment. Furthermore, the *Matsushita* Court reiterated that § 1738 also applies even when the state court judgment might work to bar litigation of exclusively federal claims, as the Court had held in *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 1331–32, 84 L.Ed.2d 274 (1985). Finally, in a decision with facts close to those at hand

here, the Court concluded in Kremer that state court proceedings might be issue preclusive in Title VII suits in federal court. 456 U.S. 461, 470–72, 102 S.Ct. 1883, 1891–92, 72 L.Ed.2d 262.

 We must therefore look to the law of Illinois to see what effect the Illinois courts would give to the judgments in the earlier state proceedings. This court discussed the Illinois law of preclusion extensively in *LaSalle National Bank of Chicago v. County of DuPage,* 856 F.2d 925 (7th Cir.1988), and our research indicates that it has not changed materially since that time. Under Illinois law, a final judgment on the merits rendered by a court of competent jurisdiction bars the same party or those in privity with the party from relitigating matters that were raised or could have been raised in the prior action. The Supreme Court of Illinois explained, in *Hughey v. Industrial Commission,* that the rule applies to every question relevant to and falling within the purview of the original action. 76 Ill.2d 577, 582, 394 N.E.2d 1164, 1166, 31 Ill.Dec. 787, 789 (1979). See also *Housing Authority for La Salle County v. YMCA of Ottawa,* 101 Ill.2d 246, 251–52, 461 N.E.2d 959, 961, 78 Ill.Dec. 125, 127–28 (1984). A simple change in theory is not enough to defeat the operation of the rule. See *LaSalle National Bank,* 856 F.2d at 932, quoting from *Hagee v. City of Evanston,* 729 F.2d 510, 514 (7th Cir.1984).

Decisions from the Illinois Appellate Courts make it clear that Illinois applies these principles to claims addressed in administrative proceedings that are "judicial" in nature. In *Osborne v. Kelly,* 207 Ill.App.3d 488, 565 N.E.2d 1340, 152 Ill.Dec. 422 (Ill. App., 4th Dist.1991), the court explained the rule as follows:

> It is well established that res judicata can preclude litigation of causes of action or issues already addressed in an administrative proceeding that is judicial in nature
> . . .
>
> * * * * * *
>
> Where res judicata applies, it attaches to the administrative decision, rather than to the decision of the circuit court when judi-

cial review is sought, as long as there is no discrepancy between the two.

207 Ill.App.3d at 491, 565 N.E.2d at 1342, 152 Ill.Dec. at 424. See also *Rhodes v. St. Charles Manufacturing Co.,* 149 Ill.App.3d 821, 823, 500 N.E.2d 1107, 1108, 103 Ill.Dec. 36, 37 (Ill.App., 2d Dist.1986) ("[t]he doctrine of res judicata applies to decisions of the Industrial Commission where the issues and parties are identical"; court finds res judicata based upon arbitrator's award).

In this case, the parties agree that two of the three elements necessary for claim preclusion are satisfied. First, the parties are identical, and second, there has been a final judgment in a state court proceeding. The only disputed issue is one of law, which we are entitled to review *de novo:* did the two proceedings raise the same claim or cause of action, such that the federal action is barred. As this court noted in *Hagee,* 729 F.2d at 512–13, Illinois courts in the past sometimes asked whether the same evidence would sustain both actions and sometimes took an approach closer to the *Restatement (2d) of Judgments,* which uses a "same transaction or occurrence" test. See *Restatement (2d) of Judgments* § 24 comments a, b, and c (1980). Recently, the Supreme Court of Illinois appeared to opt for the "same evidence" test, in *Torcasso v. Standard Outdoor Sales,* 157 Ill.2d 484, 491, 626 N.E.2d 225, 228, 193 Ill.Dec. 192, 195 (1993).

The outcome here would be the same under either the "same evidence" approach or the Restatement's "same transaction" approach. It is crystal clear from reading both the ILLRB's opinion and the Appellate Court's opinion that the state litigation centered on the question whether the FOP entered into the settlement with the City for the purpose of discriminating against white members of the FOP, and that both tribunals found no evidence to support such a claim. Majeske herself argues that the allegations in the state and the federal proceedings were identical. See Appellant's Brief at 14, 19. How the FOP behaved, the circumstances of the Meyers settlement, the manner in which the FOP communicated with its members, its willingness (or unwillingness) to use race-based promotion criteria, were the key issues

in the state proceedings, and they would be the key issues in the proceeding under the "labor organization" part of Title VII, 42 U.S.C. § 2000e–2(c)(1).

We conclude that Illinois would find a suit analogous to Majeske's Title VII action barred by claim preclusion. Following the command of the Full Faith and Credit statute, as the Supreme Court has construed it in *Kremer, Marrese,* and *Matsushita,* we therefore find that the district court correctly ruled that the Title VII action was similarly barred.

The judgment of the district court is AF-FIRMED in all respects.