**Harold B. SMITH and Illinois Republican Party, Plaintiffs–Appellants,**

v.

**Kenneth R. BOYLE et al., in their official capacity as members of the Illinois State Board of Elections, Defendants–Appellees.**

No. 97–2191.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1997.

Decided May 21, 1998.

James R. Schirott (argued), Schirott & Luetkehans, Itasca, IL, Patrick J. O'Shea, Lombard, IL, Patrick K. Bond, Bond, Mork & Dickson, Wheaton, IL, for Plaintiffs–Appellants.

Rita M. Novak, A. Benjamin Goldgar (argued), Office of the Attorney General, Chicago, IL, for Defendants–Appellees.

Dennis A. Rendleman, Athena T. Taite, Illinois State Bar Association, Springfield, IL, for Amicus Curiae.

Before POSNER, Chief Judge, and BAUER and FLAUM, Circuit Judges.

POSNER, Chief Judge.

The Illinois Republican Party and its chairman appeal from the dismissal, 959 F.Supp. 982 (C.D.Ill.1997), on grounds of justiciability, of their suit for a declaration that the method prescribed by the state constitution for electing justices of the Supreme Court of Illinois in Cook County violates the equal protection clause of the Fourteenth Amendment. See Ill. Const. Art. VI, §§ 2, 3. As amended in 1970, the constitution divides the state into five districts for purposes of electing supreme court justices. One of the districts is Cook County, which includes Chicago and surrounding suburbs. Three of the seven justices are elected by Cook County voters in at-large elections; each of the remaining four is elected by the voters of one of the other districts. This system violates the principle of "one person, one vote," but that is not the plaintiffs' complaint—and for the excellent reason that the principle is inapplicable to judicial elections challenged as denials of equal protection. *Wells v. Edwards*, 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973), aff'g 347 F.Supp. 453 (M.D.La.1972) (three-judge district court). The complaint is that the use of the at-large method in Cook County denies members of a particular group, namely Republicans, a fair opportunity to elect candidates of their choice. *White v. Regester*, 412 U.S. 755, 765–70, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Republican Party v. Martin*, 980 F.2d 943

(4th Cir.1993); cf. *Barnett v. Daley*, 32 F.3d 1196, 1198–99 (7th Cir.1994); *Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir.1990). Cook County as a whole has more Democratic than Republican voters, and although Republicans are sometimes elected to county office, no Republican has been elected to the supreme court from Cook County since the 1970 amendment of the state constitution. The suburban areas of the county, however, are heavily Republican, with the consequence that if Cook County were divided into three districts for the election of supreme court justices (which the state constitution forbids, *Cincinnati Ins. Co. v. Chapman*, 181 Ill.2d 65, 229 Ill.Dec. 264, 268–69, 691 N.E.2d 374, 378–79 (1998)), then, provided the districts were not gerrymandered, the Republicans would have a good shot at electing one justice. So an effect of the at-large system is to deprive Republicans in Cook County of the power they would have under a districted system to elect a Republican justice.

The equal protection clause has been interpreted to require some degree, often a high degree (notably in legislative reapportionment cases, where the rule of "one person one vote" reigns), of equality in voting power, in the sense that each voter's vote should have to the extent feasible the same weight in the political process as every other voter's vote. Of course, the goal of equality of voting power must remain to a considerable degree aspirational. The system for electing United States Senators, a system not only embedded in the Constitution but expressly placed beyond the power of alteration by Article V, has the effect of weighting votes for Senators in states that have a small population more heavily than the votes for Senators in states that have a large population. And voters in swing districts have more effective voting power than voters in districts that are politically lopsided. These disparities cannot be corrected. Others can be. The Court long ago held racial gerrymandering unconstitutional. *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); see also *id.* at 349, 81 S.Ct. 125 (concurring opinion). Later it held that state legislative districts must have the same population. *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Then that gerrymanders aimed at diluting the voting power of supporters of one of the political parties were, like racial gerrymanders, justiciable. *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). And later still that malapportionment of judicial election districts could violate the Voting Rights Act. *Chisom v. Roemer*, 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). The Supreme Court has not yet had a case in which the use of at-large elections to fill judicial offices is challenged as a denial of equal protection because aimed at preventing the election of candidates of one of the parties. But like the Fourth Circuit in *Republican Party v. Martin*, *supra*—the only case similar to this one that we've found—we cannot see an objection in principle to what would be after all only a modest extension of existing law. The at-large election is a familiar device, as we know from such cases as *Cane v. Worcester County*, 35 F.3d 921, 925–27 (4th Cir.1994), and *Westwego Citizens for Better Government v. City of Westwego*, 946 F.2d 1109, 1116–23 (5th Cir.1991), for reducing the voting power of a minority, whether racial or political; and the reduction is the same whatever the office, whether legislative, executive, or judicial, is to be filled by election.

Suppose, to take a simplified version of the present case, that a state is divided into four legislative districts of which one has 50 percent of the population and the other three 16.67 percent each. The large district elects 3 legislators, all at large, and the small ones elect 1 legislator each. Party A is supported by 60 percent of the voters in the large district, Party B by the other 40 percent. Therefore Party A's candidates win all three seats. But suppose that support for the two parties is uneven across the large district; if that district were divided into three equal parts without regard to politics, Party A would command the support of 80 percent of the voters in each of two subdistricts but Party B would command the support of 80 percent of the voters in the third subdistrict. (To see this, imagine that there is a total of 1,200 voters in the district as a whole, 400 in each subdistrict. Party A will then have 720 voters in total ($.6 \times 1,200$) of whom 320 will be in the first subdistrict ($.8 \times 400$), 320 in

the second, and therefore only 80 (720 - 320 - 320) in the third: 20 percent.) So A would end up with two seats and B with one. B's supporters would still have less effective voting power than A's, because B with 40 percent of the votes would elect only 33 percent of the legislators from the district and A with 60 percent would elect 67 percent of the legislators. Still, that is far different from 40 percent of the electorate electing zero percent of the legislators and 60 percent of the electorate electing 100 percent of the legislators.

■ Given the experience that the courts have had with challenges to at-large elections, including at-large elections for judges (*Chisom*), we cannot understand the basis for the district court's holding that the challenge to the at-large system for electing state supreme court justices from Cook County is not justiciable. Judicial reluctance to enter the political thicket of state electoral systems was overcome many years ago, and we cannot see what difference it makes that the election is of judges rather than of legislators. The district judge expressed understandable reluctance to enter the "quagmire" of electoral reform, but did not explain why the quagmire is any deeper when the election is of judges. It is true as he remarked that judges perform different functions from legislators, but we do not see how this bears on justiciability.

The concept of justiciability is designed to confine the federal courts to the traditional core judicial functions of Anglo–American judiciaries. So when there is no "case" in that traditional sense, because of mootness, lack of adversity, lack of standing in the sense either that the plaintiff has suffered no injury from the defendant's alleged wrongdoing or the court cannot grant relief that will confer a benefit on the plaintiff, lack of any law to apply (as when the court is asked to decide a "political question" in the sense of a question that lies outside judicial competence because of lack of judicially administrable standards or an unwillingness to "take on" a coequal branch of government in sensitive areas such as foreign relations), the suit will be dismissed as nonjusticiable. E.g., *Steel Co. v. Citizens for a Better Environment*, —— U.S. ——, 118 S.Ct. 1003, 1016–20, 140 L.Ed.2d 210 (1998); *Spencer v. Kemna*, ——

U.S. ——, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998); *Nixon v. United States*, 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993); *United States v. Johnson*, 319 U.S. 302, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943) (per curiam). None of these conditions is present in this case. The Illinois Republican Party and its chairman have a real dispute with the State of Illinois; the equal protection clause provides a legal framework for its resolution; a judicial decree (for example splitting Cook County into three compact districts equal in population, each to elect one supreme court justice) could be entered that would provide the plaintiffs with real relief from the harm inflicted on them by the wrong that they allege; and redistricting (essentially what the plaintiffs are requesting) is no longer considered to present a "political question" blocking the exercise of federal jurisdiction.

■ It is true that the "one person, one vote" rule is inapplicable to a vote-dilution claim. *Chisom v. Roemer*, supra, 501 U.S. at 403 n. 32, 111 S.Ct. 2354. Electoral districts cannot be configured in such a way that every racial, ethnic, political, or other group that might have strong political preferences has a proportionately equal chance of electing the candidates of its choice. But the Supreme Court crossed this bridge—the bridge that spans the objections to justiciability that are based on the absence of easily administrable legal standards—as long ago as *Gomillion*, where it first entertained a vote-dilution claim. And in *Chisom* the Court held that the notably vague standard of the Voting Rights Act—"totality of circumstances"—was nonetheless sufficiently administrable by courts to make claims of vote dilution in judicial elections justiciable. 501 U.S. at 402–03, 111 S.Ct. 2354. See also *Republican Party v. Martin*, supra, 980 F.2d at 950–52; cf. *Voter Information Project, Inc. v. City of Baton Rouge*, 612 F.2d 208 (5th Cir.1980). And Chisom was decided after the Supreme Court had held that the one person, one vote rule does not apply to judicial elections. If vote dilution in judicial elections is justiciable under an open-ended "totality of circumstances" law, it is justiciable under the no more open-ended equal protection clause.

■ We conclude that this suit is justiciable and proceed to the merits, noting first that to be actionable a denial of equal protection must be intentional. E.g., *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Personnel Administrator v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *People Who Care v. Rockford Board of Education,* 111 F.3d 528, 534 (7th Cir.1997); *Majeske v. Fraternal Order of Police,* 94 F.3d 307, 311 (7th Cir.1996); *Hayden v. Grayson,* 134 F.3d 449, 452–53 (1st Cir.1998); *United States v. Changco,* 1 F.3d 837, 840 (9th Cir.1993). It follows that disparate impact—a law's *unintentionally* bearing harder on one group than another— is not a permissible basis for finding a denial of equal protection. *Columbus Board of Education v. Penick,* 443 U.S. 449, 464, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *United States v. Washington,* 109 F.3d 335, 338 (7th Cir. 1997); *Majeske v. Fraternal Order of Police,* supra, 94 F.3d at 311; *Hayden v. Grayson,* supra, 134 F.3d at 453. Disparities can be used as evidence of intentional discrimination, *Personnel Administrator v. Feeney,* supra, 442 U.S. at 279 n. 24, 99 S.Ct. 2282, and sometimes, as was the case in *Gomillion v. Lightfoot, supra,* 364 U.S. at 341, 81 S.Ct. 125, they are so glaring and so patently without justification as to give rise to an irresistible inference that they are the consequence of intentional discrimination. See also *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). But that is not the case here. Given the decisions not challenged here to fill the office of supreme court justice by partisan election, to have a supreme court of seven justices, and to elect the justices from districts rather than have statewide at-large elections, the State of Illinois faced the difficult question of how to district the state for this electoral purpose. If it divided it into seven districts on the basis of population, Cook County, with a little more than half the state's population, would be entitled to three and a half districts. And this meant that if, in recognition that a county is a community of interest, no district were to cross the county line, Cook County would have to have either three or four districts. Either way, each supreme court justice from Cook County would represent a tiny (relative to the other districts in the state) though densely populated geographical area. This might be thought to encourage too parochial an outlook or to limit the field of selection too tightly. The alternative chosen was to give Cook County as many justices as it would be entitled to if it had three districts, but to make the candidates for these positions run at large, so they would have a county-wide perspective and so the field of selection of candidates would be county-wide. This alternative to splitting the County into three or four districts, or creating districts that crossed the county line, was not so irrational from a nonpartisan "good government" standpoint as to prove without more that the actual motive was partisan.

We are not saying that the justification that we have just sketched was the actual reason for the adoption of the challenged system. We have no idea whether it was. But because such a justification is possible, the plaintiffs could not ask the district court to infer from the system itself, with no (other) evidence of motive, that the motive was a bad one. Since the suit was dismissed on the pleadings, the plaintiffs had no opportunity to present such evidence. But in their reply brief in this court, responding to the defendants' alternative contention that the complaint, although detailed, does not allege facts that if proved would support an inference of intentional denial of equal protection of the laws, so that the suit should have been dismissed on the merits even if justiciable, the plaintiffs argue that the facts alleged in the complaint are enough to support an inference of intentional discrimination, so that the dismissal of the complaint was premature. They allude vaguely to a desire to prove additional facts but do not indicate what facts they have in mind.

■ A plaintiff is not held to the factual allegations of his complaint when he is faced with a motion to dismiss it for failure to state a claim. He can oppose the motion, either in the district court, or, if the motion is granted, on appeal, with any factual allegations that are consistent with the allegations of the complaint. *American Inter–Fidelity Exchange v. American Re–Insurance Co.,* 17 F.3d 1018, 1022 (7th Cir.1994); *Harrell v. United States,* 13 F.3d 232, 236 (7th Cir.

1993); *Orthmann v. Apple River Campground, Inc.,* 757 F.2d 909, 914–15 (7th Cir. 1985); *Swin Resource Systems, Inc. v. Lycoming County,* 883 F.2d 245, 247 (3d Cir. 1989). And he can of course argue in the alternative—that the facts alleged in the complaint are sufficient by themselves to state a claim, but if not then they are at least consistent with stating a claim. But the plaintiffs have pointed to no facts that they want to prove other than those alleged in the complaint. They have no other facts because they waited too long to bring this suit. The discrimination of which they complain occurred almost thirty years ago, when the state constitution was amended to create the at-large system for judicial elections. It is too late to conduct discovery to learn the motives of the proponents of the amendment. The plaintiffs are stuck with the published legislative history, which in some cases would suffice to establish an intentional violation of the Constitution, see *Edwards v. Aguillard,* 482 U.S. 578, 587–93, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); *id.* at 599–602 (concurring opinion); *Wallace v. Jaffree,* 472 U.S. 38, 56–60, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. at 268, 97 S.Ct. 555; see also *Bown v. Gwinnett County School District,* 112 F.3d 1464, 1471–72 (11th Cir.1997)—but not in this case.

All that the plaintiffs can hope to show at this late date, with the evidence they have or can obtain, is that the Democrats favored the at-large approach to electing supreme court justices in Cook County in the 1970 constitutional convention and that the approach has indeed favored Democratic candidates for those positions. The Republicans opposed the approach, but mainly because they wanted to substitute gubernatorial appointment of supreme court justices for election. There is a great deal to be said for appointing judges rather than for electing them, Steven P. Croley, "The Majoritarian Difficulty: Elective Judiciaries and the Rule of Law," 62 *U. Chi. L.Rev.* 689 (1995), let alone for electing them in partisan elections. But a preference for the electoral method cannot be read automatically as a desire to dilute the voting power of one's political opponents, given the neutral reasons that might be offered for not making election districts for state supreme court jus-

tices smaller than a county, any more than the Republicans' preference for appointed justices can be read automatically as motivated by the fact that the Republican Party has dominated the Illinois governorship for the last two decades.

As we said earlier, it may well be infeasible to obtain better evidence of intent when one is dealing with a constitutional amendment adopted many years ago—and by a referendum, expressing the views of the electorate and not just of some backroom schemers—and when the real vice may be the failure to change the method of election now that experience has shown that it really does discriminate against Republican candidates. But inability to obtain evidence of an essential element of a claim is not a good reason for dispensing with the element, and anyway that is something that only the Supreme Court, which is responsible for the rule that denials of equal protection must be intentional to be actionable, can do. We cannot accept the suggestion that *Davis v. Bandemer* fixes a lower threshold for proof of a denial of equal protection in a political vote dilution case than in a racial one. An intentional denial must be proved, and cannot be inferred just from the fact that the challenged method of election favors one party. There would no end to litigation, since a method of election is bound to favor one party over another and thus be constitutionally suspicious if *Davis* allows intention to be inferred from consequences.

*Republican Party v. Martin, supra,* is consistent with these principles, even though the court found a prima facie violation. At issue was a North Carolina law that provided for the election of superior court judges in statewide elections. As a result of this system, only one Republican had been elected to a superior court judgeship in literally hundreds of elections, 980 F.2d at 948, even though Republicans constituted almost half the state's voters, *id.* at 949; and since the superior court judges had a local jurisdiction, no neutral, "good government" explanation for the statewide at-large method of electing them was discernible. *Id.* at 955. In these circumstances, taken against the background of North Carolina's history as a "one-party state," an inference of deliberate vote dilution fairly leapt out at the reader of the

complaint. No such inference is possible here.

All that the plaintiffs would have had to do to update the record and present some evidence of intentional discrimination was to press for a constitutional amendment changing the at-large system and to make a careful record of the reaction of the Democratic Party to the proposal. The plaintiffs have offered to prove that after the oral argument of this appeal the Illinois senate voted on a resolution to amend the state constitution to allow the division of Cook County into three districts for the election of supreme court justices—and the Democrats voted in a bloc against the resolution and as a result it failed for want of the required supermajority for constitutional amendments. But in the absence of legislative history, to which the plaintiffs have not directed us, the Democrats' preference for the system that favors them cannot be equated to intentional discrimination, given the neutral objections noted earlier to districting the county for purposes of judicial elections.

To summarize, the suit is justiciable, contrary to what the district judge thought, but it fails to state a claim because the plaintiffs have not alleged and do not seek an opportunity to prove facts essential to establish that the discrimination of which they complain is intentional. So far as appears, the electoral practice that they challenge was adopted and is maintained because the alternatives are even worse from a good-government standpoint. We therefore modify the judgment of the district court to base dismissal on lack of merit rather than on lack of jurisdiction and we affirm the judgment as modified.

MODIFIED AND AFFIRMED.

FLAUM, Circuit Judge, concurring in part and dissenting in part.

Had we been presented with this constitutional claim prior to the Supreme Court's decision in *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), I may well have heeded the well-worn admonitions of certain Justices of that Court that the federal courts have no business venturing into the political thicket, *see, e.g., Reynolds v. Sims*, 377 U.S. 533, 620, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (Harlan, J., dissenting); *Colegrove v. Green*, 328 U.S. 549, 556, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946) (Opinion of Frankfurter, J.), and concluded that such concerns are particularly salient in the context of adjudicating political gerrymandering claims. Cf. *Bandemer*, 478 U.S. at 147–48, 106 S.Ct. 2797 (O'Connor, J., concurring in the judgment) ("[T]he cases on which the Court relies do not require that we take this next and most far-reaching step into the 'political thicket.'"). Given *Bandemer*, however, I concur with the Majority's conclusion that the plaintiffs' claim presents a justiciable controversy. I part ways with the Majority with respect to its adjudication of the motion to dismiss the plaintiffs' complaint. Unlike the Majority, I believe that the plaintiffs' allegations could support their equal protection claim. Without expressing any views regarding the ultimate merits of the plaintiffs' claim, I would remand the case to the district court, which is uniquely qualified to make factual findings on the essential elements of discriminatory purpose and effect. *See, e.g., Rogers v. Lodge*, 458 U.S. 613, 622–23, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). Therefore, I respectfully dissent.

As a starting point, I agree with the Majority's premise that the plaintiffs must establish the element of intent in order to state an actionable equal protection claim. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), made this requirement clear with respect to equal protection claims generally, and *City of Mobile v. Bolden*, 446 U.S. 55, 67–68, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), concluded that this principle was similarly applicable to minority vote dilution claims under the Fourteenth Amendment, regardless of a voting scheme's discriminatory effect. *Bandemer* makes this explicit with respect to political gerrymandering claims as well: "[I]n order to succeed the Bandemer plaintiffs [are] required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." 478 U.S. at 127, 106 S.Ct. 2797. The Majority, however, appears to conclude that "intent," an elusive concept in and of itself,[1] has only one substantive formulation in the equal protection context. According to the Majority,

---

1. *Compare, e.g., City of Mobile*, 446 U.S. at 137, 100 S.Ct. 1490 (Marshall, J., dissenting) ("One

save for the extreme circumstance, see Maj. Op. at 1063–64 (citing *Gomillion v. Lightfoot*, 364 U.S. 339, 341, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)), intent can be satisfied only by legislative history or evidence of clearly displayed motives of the amendment's proponents—the proverbial "smoking gun." This belief is controverted by *Bandemer*—the controlling political gerrymandering decision of the Supreme Court—which provides the standards for our review of the sufficiency of the plaintiffs' complaint.

The Majority, however, gives but a slight nod to *Bandemer*, as is apparent in its discussion of the merits of the plaintiffs' claim.[2] While still requiring proof of intent, the *Bandemer* plurality set forth a qualitatively different standard than that required by the Majority today:

> useful evidentiary tool, long recognized by the common law, is the presumption that 'every man must be taken to contemplate the probable consequences of the act he does.' ") (quoting *Townsend v. Wathen*, 103 Eng. Rep. 579, 580–81 (K.B. 1808)), *with Personnel Adm'r v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) ("'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences.").

**2.** I am aware that those portions of the *Bandemer* decision discussing the merits of a political gerrymandering claim represented the views of only a four-Justice plurality of the Court. *See* 478 U.S. at 184 n. 25, 106 S.Ct. 2797 (Powell, J., dissenting). When faced with the opinions of a fragmented Court, we are to view the holding of the Court as the position taken by those justices concurring in the judgment on the narrowest grounds. *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). I believe that the Bandemer plurality opinion provided the narrowest grounds for the Court's decision, and would apply it here, as have a number of other federal courts. *See, e.g., Republican Party v. Martin*, 980 F.2d 943, 955 n.22 (4th Cir.1992), *cert. denied*, 510 U.S. 828, 114 S.Ct. 93, 126 L.Ed.2d 60 (1993); *Pope v. Blue*, 809 F.Supp. 392, 395 & n. 2 (W.D.N.C.) (three-judge court), summarily aff'd, 506 U.S. 801, 113 S.Ct. 30, 121 L.Ed.2d 3 (1992); *Badham v. Eu*, 694 F.Supp. 664, 668–69 (N.D.Cal.1988) (three-judge court), *summarily aff'd*, 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1989).

**3.** I recognize that the multimember judicial district challenged by the plaintiffs in this case was established not by legislation but rather by a state constitutional provision ratified by a popu-

[W]e think it most likely that whenever a legislature redistricts, those responsible for the legislation will know the likely political composition of the new districts and will have a prediction as to whether a particular district is a safe one for a Democratic or Republican candidate or is a competitive district that either candidate might win.

478 U.S. at 128, 106 S.Ct. 2797; *see also id.* at 129, 106 S.Ct. 2797 ("As long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended.").[3] While this construction may appear to conflict with the principle that discriminatory effect will not suffice to establish intent in the ordinary case, it comports with other articulations of the Fourteenth Amendment's intent requirement in the voting rights context.[4] *See, e.g., Rogers v.*

lar referendum. While the motives of "the people" responsible for ratifying a state constitutional provision may be difficult, if not impossible, to discern, I agree with the Majority's implication that in such cases we can attribute the "motives of the proponents of the amendment," Maj. Op. at 1065, to the constitutional provision itself. Otherwise, unless we were able to discern the motives of the ratifying populace, or the constitutional provision gave rise to "glaring" disparities that were "patently without justification," *see* Maj. Op. at 1064, discrete and insular minorities suffering from the discriminatory effects of a facially neutral state constitutional provision would find no refuge in the Equal Protection Clause. This result would be particularly perverse in instances where the political process—manifested by legislation—is unable to overcome the discrimination enshrined in a state constitution. *See Lucas v. Forty–Fourth Gen. Assembly*, 377 U.S. 713, 736–37, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964) ("A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be."). Such is the present case, as the Illinois Supreme Court has held that Cook County's multimember judicial district is mandated by that state's constitution. See *People ex rel. Chicago Bar Ass'n v. Board of Elections*, 136 Ill.2d 513, 146 Ill.Dec. 126, 558 N.E.2d 89 (1990).

**4.** Bandemer's plurality opinion, authored by Justice White, heavily relied upon many of the Court's decisions addressing equal protection challenges to individual multimember voting districts by racial minorities. *See* 478 U.S. at 131 & n. 12, 106 S.Ct. 2797 (citing, *inter alia*, *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d

*Lodge,* 458 U.S. 613, 618, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) (recognizing that, in adjudicating an equal protection challenge by racial minorities to an at-large voting scheme, "discriminatory intent need not be proved by direct evidence" and, accordingly, "determining the existence of a discriminatory purpose 'demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available'") (quoting *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555); see also *Shaw v. Reno,* 509 U.S. 630, 646–49, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (recognizing that "redistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors").[5] In any event, without further guidance from the Supreme Court, we are required to adhere to the mandate set forth in *Bandemer* to determine whether the plaintiffs' complaint has alleged a *prima facie* case of vote dilution through political gerrymandering. See *Republican Party v. Martin,* 980 F.2d 943, 955 (4th Cir.1992), cert. denied, 510 U.S. 828, 114 S.Ct. 93, 126 L.Ed.2d 60 (1993).[6]

Against this legal backdrop, I believe that the plaintiffs' complaint in this case satisfies *Bandemer's* threshold intent requirement. The plaintiffs have described numerous attempts to divide the First Judicial District into three smaller districts, the most recent of which was an unsuccessful attempt to amend the state constitution just last month. As the Majority notes, *see* Maj. Op. at 1066, this attempt failed to garner the requisite super-majority in the Illinois senate because the entire Democratic delegation voted against it. The Majority downplays the significance of this fact, due to the plaintiffs' failure to provide the Court with the "legislative history" of the unsuccessful amendment. However, given *Bandemer's* recognition that a legislative body is presumed to intend the political consequences of its districting decisions, see 478 U.S. at 128–29, 106 S.Ct. 2797, I believe that this fact, when taken in the context of the history of exclusively Democratic (Supreme Court) victories in the First Judicial District, sufficiently alleges discriminatory intent.[7] It is true that the plaintiffs have not offered, nor do they purport to possess, the type of "smoking gun" evidence required by the Majority, but such clear, uncontrovertable evidence is not critical under Bandemer. I therefore believe that the

---

1012 (1982) (White, J.), *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) (White, J.), and *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) (White, J.), and noting that "[a]lthough these cases involved racial groups, we believe that the principles developed in these cases would apply equally to claims by political groups in individual districts").

**5.** This is not to suggest that the threshold for proof of a denial of equal protection is lower in a political vote dilution case than in a racial vote dilution case. Rather, the above-cited cases indicate that the intent threshold is analogous with respect to these two types of claims. Indeed, *Bandemer* explicitly relied upon racial vote dilution cases to derive its governing principles. *See supra* note 4.

**6.** The Fourth Circuit is apparently the only other court of appeals that has had an opportunity to address *Bandemer* in a similar context. In *Martin,* the Fourth Circuit confronted a political gerrymandering claim that is quite similar to the instant case. The Republican Party challenged North Carolina's practice of statewide elections for its trial court judges, who served within local

districts in which they previously had been nominated. According to the plaintiffs in that case, only one Republican had been elected to a trial court judgeship out of the hundreds of elections conducted since 1900. In the period since 1968, Republican candidates ran for election only ten times out of approximately 220 elections; according to the plaintiffs, four of those candidates would have been successful had the general election been conducted on a districtwide basis. *See id.* at 946–49, 957. Addressing the sufficiency of the plaintiffs' complaint, the Fourth Circuit concluded that "[t]he intent standard set forth in the *Bandemer* plurality opinion is easily met." *Id.* at 955. Not only did the Democratic rejection of legislative efforts to implement districtwide elections indicate an intent to discriminate, but the court believed that the history of Republican electoral failure since 1900 "is a significant allegation of purposeful exclusion." *Id.*

**7.** An election scheme that was neutral when implemented can, through continued maintenance, be "subverted to invidious purposes" such that it constitutes purposeful discrimination. See *Rogers,* 458 U.S. at 626, 102 S.Ct. 3272. Accordingly, I conclude that under Bandemer this recent legislative action can be probative of discriminatory intent.

Majority errs in concluding that the plaintiffs failed to state a claim for want of proof of discriminatory intent.

Of course, in order to state a claim of discriminatory vote dilution, the plaintiffs must allege not only the discriminatory purpose of the voting scheme, but also that the scheme has wrought discriminatory effects. These effects must be substantial, as "the mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm." *Bandemer*, 478 U.S. at 131, 106 S.Ct. 2797. This is because the political process is commonly understood to represent the interests of the entire electorate, including those individuals who support losing candidates. See *id.* at 131–32, 106 S.Ct. 2797. Therefore, "an equal protection violation may be found only where the electoral system substantially disadvantages certain voters in their opportunity to influence the political process effectively. In this context, such a finding of unconstitutionality must be supported by evidence of continued frustration of the will of a majority of the voters or effective denial to a minority of voters of a fair chance to influence the political process." *Id.* at 133, 106 S.Ct. 2797; see also *id.* at 132, 106 S.Ct. 2797 ("[U]nconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole.").[8]

The Majority does not reach this effects inquiry, and I will not address it at length.

Briefly, though, I believe that the plaintiffs have sufficiently stated a claim of discriminatory effect. They allege that, as a result of the state constitution's multimember district scheme, it has been impossible for qualified Republicans to be elected to the Illinois Supreme Court from the First Judicial District, and that this electoral failure will continue indefinitely.[9] While these facts alone would not suffice under *Bandemer*, the plaintiffs have also alleged that the voting scheme discourages qualified Republicans from running for election to the Supreme Court from this judicial district, and that those candidates who do run are unable to finance their campaigns sufficiently due to the widespread perception that they have no opportunity of electoral success. Of course, I would remand so that the district judge could evaluate any evidence in this regard. On their face, however, these allegations support an inference not only that the election results are affected by the multimember scheme, but that the political process itself—manifested by the nomination of candidates—is affected. *Cf. Martin*, 980 F.2d at 957. Moreover, in this case the alleged discriminatory effects of the multimember scheme are exacerbated by the plaintiffs' inability to alter the scheme through the ordinary political process. The only way that the plaintiffs could alter the judicial district voting scheme is through a constitutional amendment, which requires a super-majority within the legislature and ratification by the citizenry. In my view, requiring resort to a constitutional amendment imposes a special burden on the minority—in

---

**8.** The Fourth Circuit held in *Martin* that the plaintiffs' complaint alleged a discriminatory effect as required by *Bandemer*. See 980 F.2d at 956–58. Apart from the manifest disproportionate election results, the plaintiffs alleged that "few Republicans will offer to run since the chance of success is almost nonexistent." *Id.* at 956–57.Because they asserted more than "mere disproportionate election results," as the political process itself allegedly was affected by the voting scheme, the court found *Bandemer's* discriminatory effects requirement to be satisfied and held that the plaintiffs had sufficiently stated a claim of vote dilution through political gerrymandering. *See id.* at 957–58.

**9.** The plaintiffs have also alleged facts that are analogous to the elements required to establish a racial minority vote dilution challenge to a multi-

member district under § 2 of the Voting Rights Act. *See Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Allegations contained in their complaint indicate that the Republican party is "sufficiently large and geographically compact to constitute a majority in a single-member district," that the party is "politically cohesive," and that Cook County Democrats "vote[ ] sufficiently as a bloc to enable [them] ... to defeat the [Republican's] preferred candidate." *Id.* at 51, 106 S.Ct. 2752. Although these factors are certainly neither necessary nor sufficient to establish the plaintiffs' political vote dilution claim, as political parties are not covered by the Voting Rights Act, I believe that these factors can serve as additional useful guideposts in determining whether the plaintiffs have stated a claim for which relief could be granted.

this case the Republican Party—in its efforts to participate in the political process in furtherance of its members' fundamental right to vote in judicial elections. *Cf. Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 467–70, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). Accordingly, the plaintiffs have made allegations that, if supported by the evidence, would indicate that the Illinois judicial election scheme deprives them of a fair chance to influence the political process in this regard. See *Bandemer*, 478 U.S. at 133, 106 S.Ct. 2797.

For these reasons, I conclude that the plaintiffs have stated a claim of political vote dilution. *Bandemer* merely established threshold conditions for stating a *prima facie* claim of political gerrymandering, see *id.* at 134, 106 S.Ct. 2797, and the plaintiffs have satisfied those conditions. I do not suggest that the sufficiency of the plaintiffs' complaint necessarily establishes that they would prevail on the merits. In my judgment, though, the plaintiffs have adequately alleged discriminatory purpose and effect under *Bandemer*, and I would remand this case to the trial court to evaluate the merits of their claim.